# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

vs.                                 No. **CR 04-1894 MCA**

**DENISSE S. VIDANA-SALDANA**,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** came before the Court on *Defendant's Motion to Suppress Evidence* [Doc. No. 36] filed by Defendant Denisse S. Vidana-Saldana on November 30, 2004. On December 9, 2004, the Court held an evidentiary hearing on Defendant Vidana-Saldana's motion in Albuquerque, New Mexico. Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court **DENIES** Defendant Vidana-Saldana's motion based upon the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

1. New Mexico State Police Officer James Butterfield was on duty stationed along Interstate 40 at approximately Mile Marker 309 in Quay County, New Mexico,

between approximately 7:30 a.m. and 8:00 a.m., on or about September 11, 2004, when the events described below occurred.

2.      While running stationary radar, Officer Butterfield observed a light colored, late model sport-utility vehicle traveling eastbound on Interstate 40 at 80 miles per hour, which was five miles per hour over the speed limit.

3.      Officer Butterfield also observed a towel obstructing a portion of the front windshield of the vehicle.

4.      Based on these observations, Officer Butterfield initiated a traffic stop, and the vehicle pulled over to the right side of the eastbound lane of Interstate 40.

5.      Officer Butterfield observed that the vehicle had two occupants:  Defendant Denisse S. Vidana-Saldana and a co-defendant, Martha E. House.  Defendant House was the driver of the vehicle.

6.      The traffic stop and some of the ensuing events were captured on a videotape taken from the vantage point of the front windshield of Officer Butterfield's police vehicle. [Ex. 1.]

7.      After the vehicle came to a stop, Officer Butterfield approached the front passenger-side window of the vehicle alone on foot wearing a uniform with his gun holstered.  He then began conversing with the occupants.

8.      During this conversation, Officer Butterfield sensed a strong odor, which smelled like peppers, emanating from the vehicle.  He also observed a number of air fresheners in the vehicle.

-2-

9.      Officer Butterfield attached significance to this strong odor and the presence of multiple air fresheners because based on his training and experience, such measures are sometimes used as "masking agents" to conceal the odor of narcotics or other contraband in a vehicle.

10.      Officer Butterfield proceeded to explain the reason for the stop to the vehicle's occupants.  He also asked if they had peppers in the vehicle.

11.      The occupants indicated to Officer Butterfield that they spoke Spanish, and the conversation continued with Officer Butterfield speaking primarily in English, with a few words or phrases in Spanish, and the occupants responding, for the most part, in Spanish.

12.      The driver of the vehicle, Defendant House, followed Officer Butterfield's instructions to exit the vehicle and to provide her driver's license and vehicle registration materials to him.  Defendant Vidana-Saldana initially remained in the front passenger seat of the vehicle.

13.      As Defendant House exited her vehicle, Officer Butterfield used his radio to request the assistance of another, Spanish-speaking officer in the area.

14.      Officer Butterfield then proceeded to obtain the information and fill out the paperwork necessary to confirm ownership and registration of the vehicle and issue two traffic citations to its driver, Defendant House.  One of the citations was for speeding (with a $65 fine), and the other was a warning regarding the towel obstructing a portion of the windshield area.

15.     While completing these tasks, Officer Butterfield conversed over the radio with his dispatcher to run a check on Defendant House's driver's license.  He also asked Defendant House a few questions about her travel plans.

16.     Defendant House indicated to Officer Butterfield that she was traveling from Phoenix and that her destination was Atlanta.

17.     Officer Butterfield attached significance to the fact that the vehicle was traveling eastbound from Phoenix, Arizona, because based on his training and experience, Phoenix is a "source city" or "hub" for narcotics trafficking, and such trafficking generally travels from west to east.

18.     Officer Butterfield observed that Defendant House appeared nervous, avoided eye contact with him in response to certain questions, and was moving or "wringing" her hands.  He also observed movement by Defendant Vidana-Saldana, as if she were fidgeting or looking for something in the vehicle.

19.     Officer Butterfield noted from the vehicle-registration information that the vehicle had a temporary Arizona license plate or "sticker" issued to Defendant House on the previous day, September 10, 2004, and with an expiration date of September 15, 2004.

20.     The license and registration information indicated that Defendant House was the sole owner of the vehicle.  The licensing and registration paperwork did not indicate that Defendant Vidana-Saldana had any property interest in this vehicle.

21.     While Officer Butterfield was filling out the citations, Officer Chavarria arrived at the scene in uniform with his gun holstered.

-4-

22.     Officer Chavarria also observed the vehicle registration and temporary license plate or "sticker," and he attached significance to the information contained in these items because, based on his training and experience, drug traffickers often employ such short-term, temporary licensing and registration records when they intend to use a vehicle for transporting contraband and then get rid of the vehicle after the trip.

23.     Officer Chavarria speaks both Spanish and English, and he was able to communicate effectively with both Defendant House and Defendant Vidana-Saldana in the Spanish language.

24.     Officer Butterfield informed Officer Chavarria that the vehicle's occupants spoke very little English.  Officer Chavarria allowed Officer Butterfield to continue completing the traffic citations but remained available in case he needed assistance in communicating with the Defendants.

25.      Pursuant to Officer Butterfield's request, Officer Chavarria proceeded to obtain the vehicle-identification number, or "VIN," from the vehicle for use in completing the license and registration check.

26.  As shown on the videotape, Officer Chavarria went to the front, driver's side of Defendant House's vehicle to obtain the VIN.  As he approached the vehicle, Officer Chavarria detected a strong, overpowering odor of fresh paint and a substance called "Bondo" emanating from the rear undercarriage of the vehicle.  Officer Chavarria attached significance to this odor because, based on his training and experience, Bondo and fresh

paint are often employed by drug traffickers to fabricate and conceal special compartments within a vehicle where contraband is stored.

27.   As he walked around the vehicle, Officer Chavarria looked for but did not detect any evidence of recent repairs to the exterior of the vehicle indicating a legitimate use of fresh paint or Bondo.  The strong odor of these substances indicated to him that they had been applied to the vehicle very recently.

28.   While checking the vehicle's VIN, Officer Chavarria opened the driver's side door of the vehicle and began a conversation with Defendant Vidana-Saldana.  Defendant Vidana-Saldana appeared nervous and was not maintaining eye contact as the officer asked her about her travel plans.

29.   Officer Chavarria returned to Officer Butterfield's vehicle with the VIN information and began a conversation with Defendant House in Spanish.  Defendant House told Officer Chavarria that she had just bought the vehicle for her trip to Atlanta.

30.   When Officer Chavarria tried to elicit more specific information about her trip to Atlanta, Defendant House appeared nervous.  Her breathing became more erratic, she avoided eye contact, and she tried to change the topic of the conversation.

31.   While these activities were occurring outside Officer Butterfield's vehicle, Defendant Vidana-Saldana exited the front-passenger door of the other vehicle without being instructed or prompted to do so.  She stood outside the vehicle with her purse beside her for a few moments, and then moved back into the passenger seat of the vehicle.  The officers considered this behavior unusual because, based on their training and experience, most

passengers remain within the vehicle during a traffic stop unless told to do otherwise, and they do not re-enter the vehicle while facing away from the vehicle.

32.     Officer Chavarria credibly testified that Defendant Vidana-Saldana's behavior in exiting and re-entering the vehicle raised officer-safety concerns because she was carrying a purse large enough to conceal a weapon and, based on his training and experience, the behavior she exhibited is a sign of a "fight or flight" reaction in which the passenger may be preparing to flee or to attack the officers.

33.     While Officer Butterfield was explaining the traffic citations to Defendant House and inquiring whether she would elect to pay the fine or appear in court, Officer Chavarria approached Defendant Vidana-Saldana and continued his conversation with her in Spanish.

34.     During this conversation, Officer Chavarria also observed that Defendant Vidana-Saldana's demeanor was nervous and evasive.  She could not recall the last name of the vehicle's driver, and when the officer attempted to elicit more specific information about the purpose of her trip, Defendant Vidana-Saldana avoided eye contact and attempted to change the topic of conversation.

35.     Officer Chavarria noticed that Defendant Vidana-Saldana's hands were shaking.  She kept fumbling through her collection of compact discs even though the vehicle's compact-disc player already was playing music from a compact disc.  Officer Chavarria also observed and smelled the air fresheners in the vehicle during this period.

36.     Based on the officer-safety concerns noted above, Officer Chavarria requested and received Defendant Vidana-Saldana's consent to look inside her purse for weapons. None were observed.

37.     Officer Chavarria returned to Officer Butterfield's vehicle and informed Officer Butterfield of his observations.

38.     Between fifteen and twenty minutes after the traffic stop began, and after Officer Chavarria returned to Officer Butterfield's vehicle, Officer Butterfield informed Defendant House that she was free to leave.  All of the Defendants' driver's license and vehicle registration paperwork, as well as any other personal property, had been returned to them by this time.

39.     As Defendant House turned and began walking back to her vehicle, Officer Chavarria initiated another conversation with her in Spanish, and she voluntarily responded.

40.     After asking whether she had any weapons or contraband in the vehicle and receiving a negative response, Officer Chavarria requested and received Defendant House's oral consent to search the vehicle.  The communications regarding this consent to search were conducted in the Spanish language.

41.     In addition to providing her oral consent, Defendant House reviewed and executed a written consent form in Spanish that was provided by the officers.

42.     Defendant Vidana-Saldana also reviewed and executed the written consent form in Spanish.

43.     Upon receiving the written consent form signed by both Defendants, the officers began searching the vehicle.

44.     Shortly thereafter, Officer Chavarria focused his attention on the rear cargo area and rear undercarriage of the vehicle from which the smell of Bondo and fresh paint appeared to be emanating.  He manipulated a bolt which attached the spare tire to the vehicle and observed recent cutting, jagged edges of metal, tacking, and fresh paint indicating the presence of a fabricated compartment recently installed in the vehicle.

45.     Officer Chavarria then proceeded to remove the latch to the rear door of the vehicle, thereby revealing a hole through which he could inspect what was underneath the rear cargo area of the vehicle.  Using his flashlight, Officer Chavarria observed a red cellophane bundle, which he was able to manipulate by inserting a screwdriver into the latch hole.

46.     Officer Chavarria poked the bundle with the screwdriver, and a crystallized substance which the officer recognized as methamphetamine appeared on the screwdriver's tip.  The officer then identified a means of entering the vehicle's fabricated compartment and retrieved several bundles of methamphetamine from the compartment.

47.     Upon retrieving the bundles and identifying their contents as methamphetamine, Officer Chavarria instructed Officer Butterfield to place the Defendants under arrest.

48.    Following her arrest but before any custodial interrogation occurred, Defendant Vidana-Saldana asked to be read her rights.  Officer Chavarria proceeded to provide her with all warnings required under Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny.

49.    Officer Butterfield had reasonable suspicion to initiate and conduct a traffic stop of the vehicle in which Defendants were traveling based on his observation of a speed-limit violation and the safety hazard presented by the towel covering a portion of the windshield.

50.    Based on the totality of the circumstances presented by their training, experience, and perceptions of the incident, the officers had reason to suspect that criminal activity was afoot at the time the traffic citations were issued to Defendant House.  These circumstances include:  (1) the strong odor of fresh paint, and/or "Bondo" emanating from the rear undercarriage of the vehicle, combined with the lack of any evidence of recent repairs to the exterior of the vehicle; (2) the odor of peppers and the presence of a number of air fresheners in the vehicle's passenger compartment; (3) the fact that the vehicle was reported to be traveling eastbound from Phoenix, Arizona, a source city or "hub" for illegal narcotics; (4) the Defendants' nervous and evasive demeanor; (5) the lack of specificity and evasiveness exhibited in Defendants' responses to questions about their travel plans, the purpose of their trip, and their knowledge of one another; and (6) the fact that the vehicle had been registered in Arizona only the day before and that this registration would expire in four days before the occupants completed their purported visit to Atlanta.

51.     Neither Defendant was unlawfully detained, nor had any unlawful search occurred, at the time the officers requested and received Defendants' consent to search the vehicle.

52.     Considering the totality of the circumstances, the consent of each Defendant was knowingly and voluntarily given without duress or coercion.

53.     Defendant Vidana-Saldana did not demonstrate a property interest or a legitimate expectation of privacy in the rear cargo area and rear undercarriage of the vehicle where the officers searched and discovered the fabricated compartment containing the bundles of methamphetamine.

54.     There is no evidence that Defendants were stopped, detained, or searched based on their race, ethnicity, or any other suspect classification.

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

In her motion, Defendant Vidana-Saldana contends that the investigative detention conducted by the officers was unreasonable because it exceeded the proper scope of a traffic stop, and that the evidence obtained as a result of the ensuing search must be suppressed as "fruit of the poisonous tree."  I conclude that these contentions do not have merit, and therefore Defendant Vidana-Saldana's  motion is denied.

Defendant House has entered a plea of guilty and does not contest the validity of her detention, her consent, or the ensuing search of the vehicle which was registered to her. Therefore, the Court's analysis is limited to the Fourth Amendment rights of Defendant Vidana-Saldana.

-11-

The Fourth Amendment to the United States Constitution protects this Defendant's right to be secure in her person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v. Acevedo, 500 U.S. 565 (1991). In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996). Thus, Defendant Vidana-Saldana was seized within the meaning of the Fourth Amendment when Officer Butterfield stopped Defendant House's vehicle to investigate and issue traffic citations. See id.

The seizure of Defendant Vidana-Saldana's person is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)). The subjective motivations of the officer performing the stop are not relevant to determining whether that officer's suspicions are "reasonable" under the Fourth Amendment. See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001).

Here it is not disputed that the officer's observations of a speed-limit violation and a towel obstructing a portion of the front windshield provided justification for the initial stop

of the vehicle.  Officer Butterfield credibly testified as to these reasons for initiating a traffic stop.  Thus, the traffic stop of the vehicle occupied by Defendant Vidana-Saldana was justified at its inception.  See Callarman, 273 F.3d at 1283.

Before issuing a traffic citation, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).  In this instance, the officers' actions prior to the issuance of the traffic citation fell within these permissible boundaries of a traffic stop.

The Fourth Amendment generally requires that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license, registration, and insurance information have been reviewed and found to be in proper order. See Hunnicutt, 135 F.3d at 1349.  There are, however, two relevant exceptions to this general rule.  "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occuring."  Id.  "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter."  Id.

The first of these exceptions applies in this case because the officers developed a reasonable suspicion of criminal activity which was sufficient to justify further detention for

the brief period necessary to allow the officers to finish their conversation with the vehicle's occupants and perform a brief search of the vehicle after the traffic citations had been issued. The Court's analysis of the basis for such suspicions does not depend on whether or not the officer or Defendants subjectively thought they were involved in a consensual encounter after the traffic citations were issued because "[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis."  United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  Further, determining the objective reasonableness of the suspicion that prompted the officers to want to further question Defendants and perform a search of the vehicle does not depend on any one factor or series of factors.  See United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Rather, the Court must consider the totality of the circumstances.  See United States v. Arvizu, 534 U.S. 266, 273 (2002).

"In examining the totality of the circumstances, '[c]ommon sense and ordinary experience are to be employed and deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions.'"  United States v. De La Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)).  Reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'"  Lopez-Martinez, 25 F.3d at 1484 (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).  An officer cannot, however, predicate an investigative detention solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so

-14-

innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946.

In this case, the Government presented evidence concerning a number of specific factors which may be readily susceptible to an innocent explanation if considered alone, but which nevertheless combine to form a reasonable basis for the officers' suspicions that criminal activity was afoot. See Arvizu, 534 U.S. at 277-78. In particular, the Court notes the evidence of (1) the strong odor of fresh paint, and/or "Bondo" emanating from the rear undercarriage of the vehicle, combined with the lack of any evidence of recent repairs to the exterior of the vehicle; (2) the odor of peppers and the presence of a number of air fresheners in the vehicle's passenger compartment; (3) the fact that the vehicle was reported to be traveling eastbound from Phoenix, Arizona, a source city or "hub" for illegal narcotics; (4) the Defendants' nervous and evasive demeanor; (5) the lack of specificity and evasiveness exhibited in Defendants' responses to questions about their travel plans, the purpose of their trip, and their knowledge of one another; and (6) the fact that the vehicle had been registered in Arizona only the day before and that this registration would expire in four days before the occupants completed their purported visit to Atlanta.

The officers' reasonable suspicion based on the totality of the circumstances justified further detention of Defendant Vidana-Saldana and the vehicle in which she was traveling for purposes of conducting further questioning and a brief search. To the extent that the search of the vehicle exceeded the scope of an investigative detention based on reasonable

suspicion, Defendant Vidana-Saldana is not in a position to contest that search for the following additional reasons.

In order to challenge the search of the vehicle (as opposed to the detention of her person), it is Defendant Vidana-Saldana's burden to first establish that she has an interest in the vehicle that is protected by the Fourth Amendment.  See United States v. Arango, 912 F.2d 441, 444 (10th Cir. 1990); United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990). She has not met this burden here.

The existence of a cognizable Fourth Amendment right to be free from unreasonable searches and seizures of a motor vehicle depends on two factors:  whether the individual in question has exhibited a subjective expectation of privacy in the vehicle, and whether society recognizes that subjective expectation as reasonable.   See Rascon, 922 F.2d at 586. Although formal documentation (such as a certificate of title or registration form) is not necessarily required in order to establish proof of ownership or legitimate possession, mere possession or control of the vehicle alone is not sufficient to satisfy this test.  See United States v. Jefferson, 925 F.2d 1242, 1249-50 (10th Cir. 1991); Arango, 912 F.2d at 445.

At the hearing on her motion, Defendant Vidana-Saldana did not demonstrate a claim of ownership or responsibility for the vehicle or its contents (except for the purse which she carried on her person as she exited the vehicle and perhaps a few items already in plain view such as the compact discs beside the front passenger seat).  Further, Defendant Vidana-Saldana was not the registered owner of the vehicle and could not provide the officers with a sufficient explanation of her relationship to the owner (Defendant House) or how the

vehicle legitimately came into her possession.  Under these circumstances, Defendant Vidana-Saldana demonstrated no more than mere possession of, or presence in, the vehicle. These facts are not enough to establish her standing to challenge the officers' search of the area of the vehicle where the contraband was discovered.

To the extent that Defendant Vidana-Saldana had a reasonable expectation of privacy in the area of the vehicle's interior into which the officers' intruded, her oral and written consent to the search of that area (as well as that of Defendant House) was knowing and voluntary.  To prove that a defendant's consent was knowing and voluntary, it is the Government's burden to show that their was no duress or coercion, that the consent was unequivocal and specific, and that the consent was freely and intelligently given.  See United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993).  The Government met this burden here.

Although Defendant Vidana-Saldana may argue that she remained under investigative detention at the time she signed the consent forms, that detention was reasonable in scope, and this factor alone does not render her consent involuntary.  See id.  Rather, the Court must consider the totality of the circumstances.  See id.  In particular, the Court notes that the officer requested consent in the Spanish language both orally and in writing, and there is no indication that Defendants could not understand the officer's request or attempted to raise any objection to it.  Further, Defendants' documents and any other personal property had been returned to them at the time of the request, and there is no indication of an express or implied show of force by the two officers present at the scene that would suggest the

-17-

consents were obtained under coercion or duress.  In view of the totality of the circumstances, the Court concludes that Defendants' consent to the search of the vehicle was knowing and voluntary.  See id. at 1567-68.

This is not a case where the Defendants' consent or the ensuing search was tainted by some prior unlawful conduct by the officers.  Thus, there is no basis for suppressing the evidence obtained during the search as "fruit of the poisonous tree."

By the time Officer Chavarria removed the bolt attaching the spare tire to the vehicle and detected several signs indicating the recent fabrication of a concealed compartment, the reasons for the search and seizure ripened into probable cause.  Because the officers had probable cause to believe that there was a fabricated compartment in the vehicle containing contraband, they were justified in taking further action to investigate the contents of the false compartment and remove the bundles which were found to contain methamphetamine.  See United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997) (citing United States v. Martel-Martines, 988 F.2d 855, 858-59 (8th Cir.1993)); Arango, 912 F.2d at 447.  Because the entire detention and search met the Fourth Amendment's requirement of reasonableness, the exclusionary rule provides no basis for suppressing the evidence or statements that resulted from these activities.  See United States v. Massie, 65 F.3d 843, 849 (10th Cir. 1995).

Although Defendant Vidana-Saldana's motion papers contain a claim of selective prosecution based on race or ethnicity and appear to challenge the use of this Defendant's post-arrest statements, these claims were abandoned at the hearing on December 9, 2004.

Officer Chavarria testified that he provided Defendant Vidana-Saldana with <u>Miranda</u> warnings prior to any custodial interrogation, and thus there is no basis for suppressing her post-arrest statements.  <u>See</u> <u>United States v. Gell-Iren</u>, 146 F.3d 827, 830-31 (10th Cir. 1998).

Finally, there was no evidence whatsoever that Defendant Vidana-Saldana was targeted for detention or search based on her race, ethnicity, or any other suspect classification.  To prevail on such a claim a defendant must do more than simply assert that the traffic stop was pretextual.  <u>See</u> <u>Whren</u>, 517 U.S. at 813; <u>United States v. James</u>, 257 F.3d 1173, 1178 (10th Cir. 2001); <u>Poole v. County of Otero</u>, 271 F.3d 955, 958 (10th Cir. 2001).  For all of the above reasons, Defendant Vidana-Saldana's motion must be denied.

## III.   <u>CONCLUSION</u>

Because the investigative detention and search challenged by Defendant Vidana-Saldana in this case met the applicable constitutional requirements, the exclusionary rule does not provide any basis for suppressing the evidence or statements that were produced as a result of those activities.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Suppress Evidence* be and hereby is **DENIED**.

**SO ORDERED**, this 10th day of December, 2004, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge